**SO ORDERED.**

**SIGNED this 09 day of November, 2006.**



_____
**ROBERT E. NUGENT**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| AMARILLO MESQUITE GRILL, INC., | ) | Case No. 03-12721 |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| CARL B. DAVIS, | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 05-5079 |
| | ) | |
| I.P.H.F.H.A., INC. a/k/a IPHFHA INC-PC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The chapter 7 trustee seeks to avoid as preferences under 11 U.S.C. § 547(b)[1] debtor's

___

[1] Debtor filed its chapter 7 petition prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. Unless otherwise noted, all future statutory references are to Title 11, United States Code as it existed prior to October 17, 2005.

1

payments to defendant IPHFHA for past due insurance premiums totaling $46,563.91. Defendant stipulated at trial that all elements of a preference have been established but asserts the ordinary course of business defense set forth in § 547(c)(2) and the new value defense available in § 547(c)(1). The plaintiff also filed a motion to exclude certain invoices produced belatedly by defendant and offered as exhibits at trial.[2] Trial of his matter was held July 19, 2006 and thereafter submitted to the Court, together with stipulated facts contained in the amended pretrial conference order.[3] The plaintiff-trustee Carl Davis appeared in person. Defendant appeared by its counsel, William H. Zimmerman of Case, Moses, Zimmerman & Wilson, P.A. The Court has reviewed the evidence and trial briefs submitted by the parties and is prepared to rule.

Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(F) over which this Court has subject matter jurisdiction.[4]

Burden of Proof

Because defendant stipulated at trial that plaintiff met all of the elements of a preference, the burden of proof shifts to defendant on the § 547(c) exceptions to liability.[5]

Findings of Fact

Before addressing the remaining facts and the defenses asserted in this case, the Court

---

[2] Dkt. 59 and 60. The invoices in question were marked and offered as Defendant's Ex. A (same as Plaintiff's Ex. 4).

[3] Dkt. 56.

[4] 28 U.S.C. §157(b)(1) and § 1334(b).

[5] Section 547(g); *Morris v. Kansas Drywall Supply Company, Inc. (In re Classic Drywall, Inc.)*, 121 B.R. 69, 74 (D. Kan. 1990).

2

observes that the manner in which insurance premiums were billed to and paid by debtor in this case differs materially from the manner in which premium billings are typically handled between an insurer and an individual insured-policy holder.

The factual situation here warrants a brief explanation of the various parties and their relationship to one another. Debtor was involved in the restaurant business, operating several Amarillo Mesquite Grill restaurants in Kansas and Oklahoma. Defendant I.P.H.F.H.A. ("IPHFHA") is an association of International Pizza Hut franchisees, of which debtor is a member.[6] IPHFHA provides various services and benefits to its members, including among them the right to purchase various lines of insurance coverage through IPHFHA's program. At issue in this case is the commercial insurance coverage debtor obtained for its restaurants through IPHFHA. IMA of Kansas, Inc. ("IMA") is a full service insurance broker, negotiated various lines of insurance coverage for IPHFHA members and administered the insurance program for IPHFHA members.[7]

IMA procured commercial insurance coverages for debtor through two insurers, Westport Insurance Corporation and Chubb (Federal Insurance Company). Westport provided debtor's commercial insurance package (property, general liability, and auto) and Chubb provided debtor's commercial umbrella excess coverage. The Westport coverages were billed and paid for in monthly installments while the Chubb coverage was billed and paid on a quarterly basis. As explained below, IMA issued the invoices.

IMA's general counsel, Sue Ann Schultz, testified at trial and explained the billing procedure

---

[6] I.P.H.F.H.A. is the acronym for International Pizza Hut Franchise Holders Association. As explained at trial, many members of IPHFHA hold multiple and various restaurant franchises.

[7] IMA has had the IPHFHA account since 1993. IMA estimated that there were 105 participants in the IPHFHA insurance program.

for IPHFHA members participating in the insurance program. IMA first generates via its computer system the invoice for insurance premiums. IMA then replicates the invoice on IPHFHA letterhead, manually overriding certain information on the internally generated invoice (*i.e.* to whom to remit payment).[8] IMA then sends the IPHFHA invoice to the franchise member[9] and the member remits payment to an IPHFHA lock box.[10] IPHFHA maintains and periodically sweeps the lockbox and remits the lockbox proceeds together with a reconciliation to IMA.

Both the IMA and IPHFHA invoices contained the following payment term: "Premiums Due and Payable on Effective Date." Each invoice specified an effective date of the first day of the month.

IMA's history of the Amarillo account went back to 1997. The pay history received into evidence shows that debtor routinely paid the premiums for its various insurance coverages late, but did not make any lump sum payments to "catch up" its account.[11] Ms. Schultz indicated that an insured was in jeopardy of losing its coverage if it failed to pay the premiums. Before canceling coverage for nonpayment, however, the insurer was required by statute to issue a notice of intent to cancel to the insured.[12] According to Ms. Schultz, IMA had the authority to issue such a notice but

---

[8] There only difference between the IMA and the IPHFHA invoices is the party to whom to remit payment to. In all other respects (*i.e.* the amount billed for premiums, the date of the invoice, the invoice number, the named insured, and payment terms) the invoices are identical. *Cf.* Ex. A and Ex. I.

[9] IMA does not retain a copy of the invoice replicated on IPHFHA letterhead and sent to the insured.

[10] IMA did not establish or have control over the lockbox.

[11] Ex. D.

[12] *See* KAN. STAT. ANN. § 40-2,120 - 2,121 (2000).

4

had never issued to debtor a notice of intent to cancel for nonpayment of premiums. IPHFHA's employee, Ms. Carr, corroborated the invoicing and payment procedure described by Ms. Schultz. At one time, IPHFHA charged service fees for late premium payments but it discontinued the service fees in 2005. Ms. Carr acknowledged that debtor did incur some service fees for late payments but that IPHFHA did not view it as a problem account. Ms. Carr indicated that the three payments made by debtor to IPHFHA for insurance premiums prior to filing bankruptcy were not handled any differently than previous premium payments debtor had made.

With this factual background concerning the billing procedure for the insurance premiums, the Court now turns to the salient facts, as stipulated by the parties. Westport issued the commercial package policy with Amarillo as the named insured prior to Amarillo's bankruptcy. According to the policy declarations page, the policy period for the commercial insurance package procured from Westport ran from July 1, 2002 to July 1, 2003.[13] The payment schedule called for monthly installment payments. IPHFHA billed Amarillo three consecutive monthly premium installments of $13,954 each for the months of March, April, and May of 2003. At the same time, IPHFHA separately billed Amarillo three consecutive monthly premium installments of $72 each for the months of March, April and May for the automobile coverage under the commercial package, thus making the total monthly installment for the Westport coverage $14,026.

Specifically, invoice number 318764 dated February 10, 2003 was the billing for the March installment (installment 9 of 12) of the commercial package and invoice 318765 was the billing for

---

[13] Ex. E. The installment payment schedule called for monthly payments of $13,954 due the first day of each month.

the commercial automobile coverage.[14] The effective date of both was March 1, 2003 and the premium was due and payable on the effective date.

IPHFHA billed Amarillo invoice number 324759 dated March 12, 2003 for the April installment (installment 10 of 12) of the commercial package coverage and invoice 324760 for the commercial automobile coverage.[15] The effective date of both was April 1, 2003 and the premium was due and payable on the effective date.

IPHFHA billed Amarillo invoice number 320593 dated April 11, 2003 for the May installment (installment 11 of 12) of the commercial package coverage and invoice 320594 for the commercial automobile coverage.[16] The effective date of both was May 1, 2003 and the premium was due and payable on the effective date.

According to the declarations page of the Federal (or Chubb) commercial umbrella coverage policy, the policy period also ran from July 1, 2002 to July 1, 2003.[17] It called for quarterly installment payments of premiums in the amount of $4,611.00. On March 12, 2003, IPHFHA billed Amarillo invoice number 324761 for the $4,611 quarterly installment of the umbrella coverage.[18] The effective date was April 1, 2003 and the premium was due and payable on the effective date.

---

[14] Defendant's Ex. A.

[15] Defendant's Ex. A.

[16] Defendant's Ex. A.

[17] Ex. F. The installment payment schedule called for quarterly payments of $4,611 due the first day of July, October, January and April.

[18] Ex. A.

6

The invoices are set forth in sequence in the chart below.

| Invoice | Invoice Date | Amount | Due Date | Date Rec'd | Check # | Days Late |
|---|---|---|---|---|---|---|
| 318764 | 2/10/03 | $13,954 | 3/1/03 | 5/5/03 | 114953 | 66 |
| 318765 | 2/10/03 | $    72 | 3/1/03 | 5/19/03 | 115123 | 80 |
| 320872[19] | 2/18/03 | <$ 450> | | | 115123 | |
| 324759 | 3/12/03 | $13,954 | 4/1/03 | 5/19/03 | 115123 | 49 |
| 324760 | 3/12/03 | $    72 | 4/1/03 | 5/19/03 | 115123 | 49 |
| 324761 | 3/12/03 | $ 4,611 | 4/1/03 | 5/19/03 | 115123 | 49 |
| 330593 | 4/11/03 | $13,954 | 5/1/03 | 6/9/03 | 115217 | 40 |
| 330594 | 4/11/03 | $    72 | 5/1/03 | 6/9/03 | 115217 | 40 |
| | | $46,239 | | | | |

The trustee seeks to recover three checks drawn and issued by Amarillo in payment of the insurance premiums billed above:[20]

| Check No. | Check Date | Amount | Date Received |
|---|---|---|---|
| 114953 | April 14, 2003 | $14,196.20 | May 5, 2003 |
| 115123 | May 6, 2003 | $18,341.71 | May 19, 2003 |
| 115217 | May 21, 2003 | $14,026.00 | June 9, 2003 |
| | | $46,563.91 | |

Each of the checks was made payable to IPHFHA and sent to the Bank of America lockbox location. According to IPHFHA's pay history introduced at trial, check number 114953 was applied to invoice 318764, check number 115123 was applied to invoice numbers 318765, 324759, 324760, and 324761; and check number 115217 was applied to invoice numbers 330593 and 330594.[21] As

---

[19] This invoice appears to represent a credit against the commercial automobile premium due to the deletion of two vehicles from coverage. This credit does not appear on the payment history, but is reflected on the check stub of check no. 115123. *See* Ex. D and Ex. 5.

[20] Ex. B.

[21] Ex. D. Plaintiff's Ex. 5 contains the check pay stubs and also references the invoices being paid by the particular checks. It is also apparent from both the pay stubs and the pay history, that debtor remitted payment for other invoices with the three checks at issue here or paid late fees, thus explaining the reason that the amount of the checks do not exactly match the invoiced amounts.

7

indicated by the date the checks were received by IPHFHA and the effective dates of the invoices, debtor paid each of the invoices 40 to 80 days late. This was well within the range of days late reflected by Amarillo's pay history. It is also apparent from the pay history that IPHFHA invoiced debtor for subsequent insurance premiums on May 1, June 1 and July 1 of 2003. On June 11, 2003, IPHFHA swept its lockbox and sent the funds by wire transfer to IMA for remittance to the insurers.

Debtor commenced this case by filing a chapter 11 petition on May 23, 2003. On debtor's motion, the case was voluntarily converted to chapter 7 on September 27, 2004.[22] Plaintiff was appointed successor trustee and commenced this adversary proceeding against defendant on March 21, 2005.

On June 21, 2006, IPHFHA produced for the first time to the trustee the invoices on IPHFHA letterhead, marked at trial as Defendant's Exhibit A and Plaintiff's Exhibit 4.[23] The IMA invoices had previously been provided to the trustee. As explained at trial, IMA did not retain possession of a copy of the invoices on IPHFHA letterhead and had to go back and regenerate the IPHFHA invoices from its computer system in order to produce the same. After hearing the explanation provided by Ms. Schultz with respect to the preparation of the invoices, the Court is convinced that defendant has not impermissibly altered or improperly redacted the original IMA invoices. Moreover, the IMA and IPHFHA invoices differ only in their payment remittance directions. Accordingly, the Court finds that the trustee has not been prejudiced by the belated production of the IPHFHA invoices and the trustee's motion to exclude them from evidence in this proceeding is DENIED. The Court now turns its attention to the merits of IPHFHA's defenses to the preference

---

[22] *See* § 1112(a).

[23] *See* Ex. A and Ex. 4.

8

claims.

    Analysis

    A.    **"Transfer" under § 547(b)(4)**

In order to be recovered as a preferential transfer, a transfer must be made on or within 90 days before the date of the debtor's bankruptcy petition. The date of a transfer made by check is the date that check is honored, not when it is delivered.[24] Here, two of the three checks were honored pre-petition. The third, check 115217, was not honored until June 10, 2003, well after the case was commenced on May 23, 2003.[25] Therefore, only the earlier two checks issued and honored within the 90 period may be preferential transfers under § 547(b).[26]

    B.    **Ordinary Course of Business, § 547(c)(2)**

Section 547(c)(2) sets forth the ordinary course of business exception to preference liability. The trustee may not avoid as a preference a transfer that was:

> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
> (C) made according to ordinary business terms.

For purposes of § 547(c)(2), a transfer made by check of funds in a checking account occurs on the

---

[24] See *Barnhill v. Johnson*, 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed. 2d 39 (1992).

[25] Because the trustee does not seek to avoid this payment as an unauthorized post-petition transfer, the Court expresses no opinion on whether this transfer may be avoided under § 549. *See In re Mills*, 176 B.R. 924 (D. Kan. 1994).

[26] *See* Ex. B. Check 114953 in the amount of $14,196.20 was honored May 5, 2003 and check 115123 in the amount of $18,341.71 was honored May 20, 2003.

9

date the check is delivered, rather than the date it was honored.[27] In this case, the evidence presented was that the date of delivery occurred when the check was received at the Bank of America lockbox. As noted above, the third check (#115217) was delivered and honored post-petition and therefore, is not an avoidable preference under § 547(b). The other two checks were delivered to the lockbox prior to Amarillo's bankruptcy filing and are avoidable prepetition transfers unless the exceptions in § 547(c) are satisfied.

The purpose behind the ordinary course of business exception as noted in *McLaughlin v. Hoole Machine and Engraving Corp. (In re Parkline Corp.)*, is to:

> protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the debtor and the transferee ... and to leave undisturbed normal financial relations, because [such an exception] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditor during the debtor's slide into bankruptcy. *In re Jolly "N"*, 122 B.R. at 905 (quoting H.R.Rep. No. 95-595, 95th Cong., 1st Sess., 373-74 (1977), reprinted in U.S.Code Cong. and Admin.News 1978, pp. 5787, 6329, 6330).[28]

In the instant case, there is no doubt that Amarillo's checks were in payment of a debt incurred in the ordinary course of business of Amarillo and IPHFHA. Amarillo incurred periodic charges for maintaining insurance coverage on its restaurant operations and part of IPHFHA's ordinary business was to service and administer insurance programs for its member franchisees. IPHFHA, through IMA, has serviced and administered the Amarillo insurance account since at least 1997. The first prong of § 547(c)(2) is satisfied.

---

[27] *See Barnhill v. Johnson, supra*; *Bernstein v. RJL Leasing (In re White River Corp.)*, 799 F.2d 631 (10th Cir. 1986); *Rocin Liquidation Estate v. Pan-American Life Insurance Company (In re Rocor Intern., Inc.)*, 339 B.R. 508 (Bankr. W.D. Okla. 2006).

[28] 185 B.R. 164, 168 (Bankr. D. N.J. 1994).

10

The remaining two prongs of the ordinary course exception were explained by the Tenth Circuit Bankruptcy Appellate Panel (BAP) in *Payne v. Clarendon National Insurance Company (In re Sunset Sales, Inc.)*.[29]

> Subsection (B) of this section [§ 547(c)(2)] creates a subjective test, i.e., whether the transfers were ordinary as between the parties, and subsection (C) creates an objective test, i.e., whether the transfers were ordinary in the industry. *See, e.g., In re Midway Airlines, Inc.*, 69 F.3d 792, 797-98 (7th Cir.1995) (citing cases). This "defense should be narrowly construed." *Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1339 (10th Cir.), *cert. denied*, 519 U.S. 1040, 117 S.Ct. 608, 136 L.Ed.2d 534 (1996).

The subjective inquiry of whether the transfers were made in the "ordinary course of business" of Amarillo and IPHFHA considers the following factors:

> (1) the length of time the parties have engaged in the type of dealing at issue; (2) whether the subject transfer was in an amount more than usually paid; (3) whether the payments were tendered in a manner different from previous payments; (4) whether there appears any unusual action by either the debtor or creditor to collect or pay on the debt; and (5) whether the creditor did anything to gain an advantage in light of the debtor's deteriorating financial condition.[30]

Here, the course of dealing between the parties established that IMA had administered IPHFHA's commercial insurance program for debtor at least ten years. IMA generated the IPHFHA invoices and sent them to debtor approximately 20 days in advance of their due date (the first of the month). Debtor routinely paid the invoices late, anywhere from 2 days late to 245 days late. Exhibit D shows that each and every invoice since 1997 was paid late by debtor, most in the 30-90 day range. The testimony at trial established that debtor incurred an unquantified amount of late fees until IPHFHA

---

[29] 220 B.R. 1005, 1020-1021 (10th Cir. BAP 1998).

[30] *In re Parkline Corp.*, 185 B.R. at 169; *See also, In re Sunset Sales,* Inc., 220 B.R. at 1020-21; *In re Classic Drywall, Inc.,* 121 B.R. at 75 ("What is subjectively ordinary between the parties answered from comparing and contrasting the timing, amount, manner and circumstances of the transaction against the backdrop of the parties' traditional dealings.").

11

discontinued billing late fees in 2005. The three payments at issue here were not in unusual amounts and referenced the invoices being paid. As with all IPHFHA insurance premium invoices, debtor remitted payment to a Bank of America lockbox. IPHFHA sent no dunning letters nor took any other action to collect the unpaid invoices.[31] There was no evidence that IPHFHA did anything to gain an advantage or even that it was aware of debtor's deteriorating financial condition.

In *In re Classic Drywall, Inc.*, the District Court of Kansas addressed late payments in the context of § 547(c)(2) and stated: "While a payment late under the written terms of the parties' agreement is a strong indicator of a preference, this fact alone does not preclude an ordinary business exception."[32] Several courts have found late payments satisfy the ordinary business exception where a consistent course of dealing between the parties over time can be shown.[33] The Court concludes that IPHFHA has met the subjective inquiry that the transfers were ordinary between it and debtor as required by § 547(c)(2)(B).[34]

The more difficult question for the Court is whether IPHFHA has met its burden with respect to the objective test – whether the payments were ordinary in the *industry*. Ordinary business terms as used in § 547(c)(2)(C) are terms used in normal financing relations, the terms that creditors and

---

[31] *Cf. Clark v. Frank B. Hall & Company (In re Sharoff Food Service, Inc.),* 179 B.R. 669 (Bankr. D. Colo. 1995) (payments increased in amount and frequency after insurance broker contacted debtor regarding its past due premiums)

[32] 121 B.R. at 77.

[33] *See e.g., In re Classic Drywall, Inc., supra; In re R.M. Taylor, Inc.*, 245 B.R. 629, 637-38 (Bankr. W.D. Mo. 2000) (workers compensation insurance premiums paid 15 days late were within the ordinary course of business between insurer and debtor)

[34] Section 547(c)(2)(B).

12

debtors use in ordinary circumstances, when debtors are healthy.[35] There was no evidence presented of insurance industry standards regarding late premium payments.[36] This is fatal to IPHFHA's ordinary course defense. IPHFHA presented no evidence that it regularly accepted late payments from other franchise members and that it did not issue cancellation notices for other insureds who failed to remit payment on the due date. IPHFHA presented no evidence that other franchise members routinely paid their insurance premium invoices 30-90 days late, or as much as 190 and 245 days late. IPHFHA presented no evidence that it routinely departed from the payment schedule set forth in the commercial policies with other franchise members. No evidence was presented that other franchise members incurred late fees.

The only evidence remotely bearing on the industry standards was the testimony of Ms. Schultz that insurers were required by Kansas law to give ten (10) days notice of cancellation for nonpayment of premiums and that no notice of cancellation was ever sent to debtor. The required statutory notice does not determine industry standards of payment terms or late payments.[37] In any event, IPHFHA failed to present evidence that it was industry practice to not issue notice of cancellation where an insured was regularly and repeatedly 30-90 days late in paying their insurance premiums. In short, IPHFHA failed to present evidence that debtor's late payments and its acceptance of those late payments were in accord with industry practices. IPHFHA's ordinary

---

[35] *In re Meridith Hoffman Partners*, 12 F.3d 1549, 1553 (10th Cir. 1993), *cert. denied,* 512 U.S. 1206 (1994).

[36] *Cf. In re Tulsa Litho Co.*, 232 B.R. 240 (Bankr. N.D. Okla. 1998); *In re Classic Drywall, Inc., supra.*

[37] *See In re Advance Glove Manufacturing Co.*, 761 F.2d 249 (6th Cir. 1985) (In a case decided under former § 547(c)(2), Michigan's statutory grace period for curing default in premium payment did not change the date premium was due.).

13

course defense must therefore fail.[38]

Because the third check at issue here is not a prepetition transfer, IPHFHA's preference liability is $32,537.91 unless IPHFHA can prevail on the new value defense.[39]

### C. <u>Contemporaneous Exchange for New Value, § 547(c)(1)</u>

Section 547(c)(1) provides that a trustee may not avoid a preferential transfer –

> to the extent that such transfer was -
> (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
> (B) in fact a substantially contemporaneous exchange;

The rationale of this preference exception is to "protect[] transfers that do not result in a diminution of the estate – unsecured creditors are not harmed by the targeted transfer if the estate was replenished by an infusion of assets that are of roughly equal value to those that were transferred."[40] Under § 547(c)(1) IPHFHA must prove that it gave new value in exchange for each of Amarillo's payments; that IPHFHA and Amarillo *intended* each exchange to be contemporaneous, and that each exchange was in fact substantially contemporaneous.[41] New value is defined by § 547(a)(2) to include money's worth in goods, services or new credit. Congress did not set a specific time limit in § 547(c)(1) for determining whether an exchange is "substantially contemporaneous," but rather

---

[38] *See In re Sunset Sales, Inc.*, 220 B.R. at 1021-22; *Clark v. Frank B. Hall & Company (In re Sharoff Food Service, Inc.)*, 179 B.R. 669 (Bankr. D. Colo. 1995).

[39] The sum of check 114953 ($14,196.20) and check 115123 ($18,341.71) equals $32,537.91.

[40] *Manchester v. First Bank & Trust Company (In re Moses),* 256 B.R. 641, 652 (10th Cir. BAP 2000). *See also, Gonzales v. DPI Food Products Company (In re Furrs Supermarkets, Inc.)*, 296 B.R. 33, 39 (Bankr. D. N.M. 2003).

[41] *In re Furrs Supermarkets*, 296 B.R. at 39; *Everlock Fastening Systems, Inc. v. Health Alliance Plan (In re Everlock Fastening Systems, Inc.)*, 171 B.R. 251, 254 (Bankr. E.D. Mich. 1994).

14

provided a flexible standard based upon the circumstances.

The payment history of debtor's insurance account indicates that debtor's transfers on May 5 and May 19 were on account of past due premiums – insurance premiums that were due on March 1 and April 1 for insurance coverage for the months of March and April. The record is devoid of any evidence that Amarillo and IPHFHA *intended* the payments to be a contemporaneous exchange.

Nor do these facts demonstrate *in fact* a substantially contemporaneous exchange for new value. As concluded in *Larose v. Bourg Insurance Agency (In re Dick Henley, Inc.)*, the debtor receives no new value in this situation:

> The payment was on account of performance by the insurance company relating to a period of time already elapsed. . . . the reinstatement of the policy appears to have had no value to the Debtor beyond the value already received. The insurance company is simply an unsecured creditor of the Debtor; it refused to do further business with the Debtor unless the account was brought current; bringing an account current in such circumstances and thereby obtaining the right to do further business is not a contemporaneous exchange.[42]

Had Amarillo paid insurance premiums for insurance coverage during the same month as the coverage was provided, it may have qualified as a substantially contemporaneous exchange.[43] But

---

[42] 45 B.R. 693, 699 (Bankr.M.D. La. 1985). The *Henley* court went on to note that this situation may be covered by § 547(c)(4), the subsequent new value defense. But in the case at bar, IPHFHA did not plead or assert the subsequent new value defense and the Court need not address it here. *See also, Interex, Inc. v. Virtex (In re Interex, Inc.)*, 2003 WL 23807973, *3 (Bankr. D. Kan. Apr. 16, 2003) (Karlin, J.) (Payments made by debtor for past due invoices do not constitute a contemporaneous exchange for new value.).

[43] *Cf. In re Everlock Fastening Systems, Inc.,* 171 B.R. at 255 (Finding that the exchange of money payment for healthcare services was substantially contemporaneous because the payment for services occurred during the same month the services were provided.); *Rocin Liquidation Estate v. Pan-American Life Insurance Company (In re Rocor Intern., Inc.)*, 339 B.R. 508 (Bankr. W.D. Okla. 2006) (debtor's payment by check of its group life insurance premiums was contemporaneous exchange for new value where payment was contemporaneous

15

that was not the case here.  The payment of premiums for insurance coverage has been analogized to a lease payment.

> . . . the payment for healthcare services is similar to payment under a lease.  Just as a landlord provides the premises throughout the entire month, HAP provided new value in the form of healthcare services throughout the month.  In the context of leases, many courts have found that payments made in the same month of occupancy are substantially contemporaneous as long as they were paid during the month they fell due. [citations omitted.].[44]

Nor does the fact that the insurers continued to provide insurance coverage to Amarillo or that Amarillo continued in business after the transfers constitute new value.[45]

For all of the foregoing reasons and based upon the state of the record before the Court, IPHFHA has not met its burden of proving that Amarillo's transfers were excepted as preferences under § 547(c)(1).

### Conclusion

Debtor's payments by check number 114953 ($14,196.20) and check number 115123 ($18,341.71) were preferential transfers under § 547(b) and avoidable by the trustee.  Debtor's post-petition transfer by check number 115217 was not a preference and is not avoidable under § 547(b).  Defendant IPHFHA has failed to meet its burden of proving that such transfers were excepted as preferences as transfers in the ordinary course of business under § 547(c)(2), or as substantially contemporaneous exchanges for new value under § 547(c)(1).  The trustee is entitled to judgment on its complaint against defendant IPHFHA in the amount of $32,537.91.  A Judgment on Decision shall issue this day.

---

with the provision of insurance).

[44] *In re Everlock Fastening Systems, Inc.*, 171 B.R. at 255.

[45] *See In re Sunset Sales, Inc.*, 220 B.R. at 1018-20.

16

# # #

17